# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

JOHN VALVO,

                        Plaintiff,

       v.                                    6:13-CV-763
                                                 (DNH/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                       Defendant.

---

PETER W. ANTONOWICZ, ESQ., for Plaintiff
PETER JEWETT, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.   PROCEDURAL HISTORY

On December 14, 2010, plaintiff protectively[1] filed for Supplemental Security Income ("SSI") Benefits, alleging disability beginning September 1, 1994. (Administrative Transcript ("T.") at 91, 173-81).  Plaintiff's claims were denied initially on April 1, 2011. (T. 91).  Plaintiff requested a hearing, which was held by video conference on January 27, 2012 before Administrative Law Judge ("ALJ") Eric

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340. There are various requirements for this written statement. *Id.*  If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

W. Borda, and at which plaintiff and Vocational Expert ("VE") Christina Boardman testified. (T. 59-84). ALJ Borda issued a decision denying benefits on February 15, 2012, (T. 24-35), which became the final decision of the Commissioner when the Appeals Council ("AC") denied plaintiff's request for review on June 17, 2013. (T. 1-6).

## II.    ISSUES IN CONTENTION

Plaintiff makes the following claims:

(1)    The Commissioner did not properly evaluate the opinion evidence in accordance with the regulations.[2] (Pl.'s Br. at 11-18) (Dkt. No. 13).

(2)    The Commissioner erred in evaluating plaintiff's credibility. (Pl.'s Br. at 18-21).

Defendant argues that the Commissioner's decision is supported by substantial evidence. (Def.'s Br.) (Dkt. No. 14). As discussed below, this court agrees with the defendant and will recommend dismissal of the complaint.

## III.    APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

---

[2] Plaintiff cites both the regulations for disability insurance benefits ("DIB") and those for SSI. Plaintiff has applied only for SSI benefits under Title XVI of the Social Security Act. Because the regulations are essentially identical, the court will reference both the DIB and SSI regulations below.

for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)

(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the Commissioner next
> considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations. If the claimant has such an impairment, the Commissioner
> will consider him [per se] disabled . . . . Assuming the claimant does not
> have a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is unable to perform his
> past work, the Commissioner then determines whether there is other work
> which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697

F.3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has

the burden of establishing disability at the first four steps. However, if the plaintiff

establishes that his impairment prevents him from performing his past work, there is a

"limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## IV.   FACTS

The plaintiff has included a statement of facts in his brief, which the defendant has incorporated into his argument, together with the statement of facts contained in the ALJ's decision. (Def.'s Br. at 3) (citing Pl's Br. at 1-8 and T. 24-35). Rather than detailing the evidence in this case at the outset, the court will adopt the facts as stated by the plaintiff and the ALJ, discussing the relevant facts below, as necessary to address the issues raised by plaintiff.

## V.   ALJ's DECISION

The ALJ found that plaintiff has not engaged in substantial gainful activity since December 14, 2010, the date of his application for SSI benefits.[3] (T. 26). At Step 2 of

---

[3] Although plaintiff has claimed disability beginning in 1994, the ALJ noted that SSI is only payable prior to the month following the month in which the application was filed. (T. 24). Thus, even if plaintiff succeeded in his claim, he would only be entitled to receive benefits beginning January 14, 2011. The court also notes that plaintiff has previously received SSI benefits. His benefits were terminated on two previous occasions due to his incarceration for criminal convictions. He was most recently released from prison in December of 2010, and is now again applying for SSI benefits. Notwithstanding that the relevant period began in December of 2010, the ALJ noted that he considered the plaintiff's "complete medical history consistent with 20 C.F.R. § 416.912(d)." (*Id.*)

5

the sequential evaluation, the ALJ found that plaintiff had the following severe impairments: Bipolar Disorder, Panic Disorder with Agoraphobia, Post Traumatic Stress Syndrome ("PTSD"), Personality Disorder with Anti-Social Traits, Impulse Control Disorder, and Asthma. However, the ALJ determined that none of these severe impairments, alone or in combination, met or equaled the severity of a Listed Impairment at Step 3. (T. 26-28).

In making the Step 3 determination, the ALJ considered Listings 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), and 12.08 (Personality Disorders). (T. 26). Each one of these listed impairments contains a section, describing the impairment itself, with "medically documented findings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A), 12.06(A), and 12.08(A). In addition to having the medically documented findings, which establish the impairment itself, the plaintiff's impairment must meet the requirements in "paragraph B" of each of these sections. Each of the "paragraph B" sections is identical and requires that the impairment, found under paragraph A, result in "at least two of the following:"

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning, or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. §§ 12.04(B)(1)-(B)(4), 12.06(B)(1)-(B)(4), and 12.08(B)(1)-(B)(4). If plaintiff does not meet the "paragraph B" criteria, he cannot meet the listing, regardless

of whether the other requirements are met.

The ALJ examined the plaintiff's medical records and determined that he had only mild restrictions in the activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, and pace; and no episodes of decompensation which have been of "extended duration." (T. 27). The ALJ relied, in part, upon an evaluation by Dr. T. Andrews, Ph.D.[4] (T. 27). The ALJ also considered whether the requirements, listed in "paragraph C" of the listings were met. (T. 27). Regarding Listing 12.04, the ALJ found that plaintiff did not meet the "paragraph C" requirements because he could live independently, had a girlfriend and other friends, attended a gym, and was capable of getting himself to appointments.[5] (T. 27) (citing 12.04(C)). With respect to Listing 12.06, the ALJ found that plaintiff is capable of functioning independently outside his home.[6] (*Id.*)

Because the limitations in "paragraph B" of the listings above are used only to rate the severity of a plaintiff's mental impairments, they do not constitute an RFC determination. The ALJ noted this and proceeded to establish plaintiff's RFC for steps 4 and 5, which required a more detailed assessment of plaintiff's limitations. (T. 27-28).

---

[4] Dr. Andrews is a non-examining medical consultant.

[5] Paragraph C of 12.04 requires a medically documented history of a severe chronic affective disorder of at least two years duration, with symptoms or signs that are attenuated by medical or psychosocial support. The section also requires either repeated episodes of decompensation, each of extended duration, or a residual disease process that has resulted in such a marginal adjustment, that even a minimal increase in mental demands or change in the environment would cause plaintiff to decompensate, or a current history of one or more years in which the plaintiff has not been able to live outside a supportive living arrangement.

[6] Listing 12.08 does not contain a "paragraph C."

After considering the entire record, the ALJ determined that the plaintiff had the physical ability to perform work at all exertional levels. (T. 28). The ALJ then determined that plaintiff's non-exertional, mental impairments limited him to "simple, routine, and repetitive tasks." He would be "off-task" five percent of the day "in addition to regularly scheduled breaks." (*Id.*) He would have to work at a "low stress job," which is defined as a job with no fixed production quotas, no hazardous conditions, occasional decision-making, occasional changes in the work setting, no interaction with the public, occasional interaction with co-workers, and only occasional over-the-shoulder supervision. (*Id.*)

The ALJ considered all the evidence, including plaintiff's symptoms, but found that plaintiff was not credible to the extent that his stated limitations exceeded the restrictions in the ALJ's RFC determination. (T. 28-29). The ALJ reviewed and cited the portions of the plaintiff's testimony that the ALJ found relevant to his determination. (T. 28). The ALJ noted that plaintiff was incarcerated from 2001 until 2007 and again from June of 2008 until December of 2010.[7] (*Id.*) The ALJ relied upon the inconsistency between plaintiff's testimony and his daily activities, including plaintiff's ability to have a girlfriend and attend the gym regularly. (T. 33).

In reviewing the medical evidence, the ALJ specifically stated the weight that he gave to the opinion of each medical provider that he mentioned in his decision. (T. 29-

---

[7] Plaintiff apparently was a prior recipient of SSI benefits which were terminated each time he was incarcerated.

33).  The ALJ discussed Dr. Vidya A. Patil's[8] reports extensively. (T. 30-31).  Dr. Patil is plaintiff's treating psychiatrist and has been treating plaintiff since 2007, with breaks during the time that plaintiff was incarcerated.[9] (T. 385).  The ALJ gave Dr. Patil's RFC evaluations "little weight." (T. 32).  The ALJ explained the limited weight that he gave Dr. Patil's RFC by finding that, although Dr. Patil submitted very restrictive RFC evaluations,[10] including either "marked" or "extreme" limitations in various functions, these limitations were inconsistent with Dr. Patil's own treatment notes. (T. 32-33).

The ALJ also found that Dr. Patil's evaluations were inconsistent with the other medical evidence of record, including the opinion of examining consultant, Dr. Jeanne Shapiro, Ph.D. and non-examining medical consultant, Dr. T. Andrews. (T. 32-33).  Great weight was given to Dr. Shapiro's March 10, 2011 opinion that plaintiff was not

---

[8] The ALJ refers to this doctor as "Dr. Patel."  However, the correct spelling is "Patil," and the court will use the correct spelling.  Dr. Patil's practice is listed as "Mental Health Connections." *See e.g.* T. 309.

[9] In his Medical Source Statment (RFC), dated November 29, 2011, Dr. Patil states that he first began treating plaintiff in 2007, and that "[t]reatment was reinstated after release from state prison in Feb. 15th 2011." (T. 385).  The court assumes that the treatment was reinstated on February 15, 2011, because plaintiff was actually released from prison in December of 2010.  As the ALJ noted, "claimant was discharged from prison on December 1, 2010 . . . .  He filed this application for benefits on December 14, 2010." (T. 29).

[10] There are two evaluations from Dr. Patil that are RFC assessments. (T. 381-82 and 384-86).  The first is dated November 29, 2011, and is entitled "Medical Source Statement (Mental)." (T. 384-86).  The second is dated December 27, 2011, and is entitled "Medical Examination for Employability Assessment, Disability, Screening, and Alcoholism/Drug Addiction Determination." (T. 381-82).  The second RFC appears to have been completed for Oneida County Department of Social Services and contains terminology regarding limitations that is slightly different than that used by Social Security. (T. 382).  Instead of mild, moderate, marked, or extreme, the Oneida County form uses the terms "no evidence of limitations," "moderately limited," and "very limited." (*Id.*)  The December 27, 2011 RFC is less helpful because the terms are not defined.  The court will assume that the RFCs are essentially the same because they are both inconsistent with Dr. Patil's treatment notes.

getting into any fights and denied symptoms of being overly depressed, having suicidal thoughts, or having thoughts of hurting others. (T. 32). Although the ALJ rejected Dr. Andrews finding that plaintiff had an episode of decompensation because it was not supported by the evidence, the rest of Dr. Andrews's opinion was given great weight by the ALJ. (T. 32). Great weight was given to Dr. Kalyani Ganesh's statements about plaintiff's lack of physical limitations.[11] (*Id.*)

Finally, "some weight" was given to the opinions of Linea Powell, LCSW and Susant Hauptfleisch, Nurse Practitioner ("NP"). (*Id.*) The ALJ recognized that some of their reports were written in 2007, before the period at issue in this case, but noted that Ms. Powell stated in January of 2011, that it was harmful for plaintiff to live in the Rescue Mission because he was unable to deal with "close contact." The ALJ found this inconsistent with the fact that plaintiff had recently been released from prison where he had no choice but to have "close contact," although plaintiff did testify that he was often in the "box"[12] for fighting in prison. (T. 32).

Because of plaintiff's non-exertional (mental) impairments, the ALJ called VE Christina Boardman to testify at the hearing. The ALJ asked VE Boardman a hypothetical question, which took into account plaintiff's limitations pursuant to the RFC outlined above. In response to the hypothetical question, VE Boardman named three jobs that plaintiff could perform: Linen Room Attendant, Silver Wrapper, or

---

[11] Plaintiff does have asthma, but there is no dispute in this case that plaintiff is physically capable of a great variety of work. The issue is with his mental (non-exertional) limitations.

[12] Disciplinary housing in prison is often referred to as the "box." The ALJ noted that there was no evidence in the record to substantiate this claim.

Addresser. (T. 34).  Based upon this testimony, and the entirety of the record, the ALJ found that plaintiff was not disabled. (*Id.*)

## VI.  <u>TREATING PHYSICIAN</u>

### A.  **Legal Standards**

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected.  *Id.*  An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).  When controlling weight is not given, the ALJ should consider the following factors to determine the proper weight assigned to a treating physician's opinion: (1) frequency of the examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist. See 20 C.F.R. § 404.1527(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

### B.  **Application**

Plaintiff argues that the ALJ did not give appropriate weight to Dr. Patil's opinion that plaintiff had marked and extreme limitations in various functions.  As

stated above, the ALJ discounted Dr. Patil's RFC evaluation because his treatment notes were not consistent with such limitations and the stated limitations were not consistent with the other medical evidence in the record. The ALJ properly gave Dr. Patil's assessment "little weight." In Dr. Patil's November 29, 2011 RFC evaluation, he indicated that plaintiff would have "extreme" limitations in relating to family and acquaintances, dealing with the public, using judgment, relating to authority figures, and dealing with stress. (T. 384). Dr. Patil stated that plaintiff would have "marked" limitations in following rules, functioning independently, and maintaining attention and concentration. (*Id.*) The form defines "marked" as "effectively precluded from performing the activity in a meaningful manner consistently throughout an 8 hour period of time on a daily basis." An "extreme" limitation is defined as "no ability to function in this area." (*Id.*)

As the ALJ correctly pointed out, these extreme and marked limitations are inconsistent with Dr. Patil's treatment notes. On March 10, 2011, Dr. Patil stated that plaintiff was on time, a lot calmer than he was in February of 2011 (the date of his last appointment), he was staying out of trouble, he was going to the gym on a daily basis to box and "take out his aggression," "which works out fairly well with him." (T. 309). Dr. Patil stated that plaintiff had a "good trainer" and wanted to be a professional boxer. (*Id.*) These clinical observations are not consistent with an individual who has a complete inability to relate to family and acquaintances. Plaintiff apparently got along well with his trainer, and Dr. Patil also stated that plaintiff had not gotten into arguments or fights with anybody. The fact that he lives by himself in an apartment

undercuts Dr. Patil's conclusion that plaintiff had a marked limitation in functioning independently. Plaintiff denied any overtly depressed feeling, suicidal thoughts, or thoughts of hurting others.[13] (*Id.*) Dr. Patil was concerned in March of 2011 that plaintiff was refusing to take the Abilify[14] that he was prescribed. (T. 309).

On June 1, 2011, plaintiff told Dr. Patil that he was bitter about DSS, and that he could not find "the job"[15] so he was very frustrated. (T. 355). In this report, Dr. Patil stated that plaintiff went out with his friends, but they frustrated him, and he got upset and angry. Although Dr. Patil also states that plaintiff "always has the impulse to beat somebody up and he talks about it openly," plaintiff also told Dr. Patil that he was trying to control his anger through therapy. (*Id.*) He denied any suicidal thoughts, overt depression, or anxiety. (*Id.*)

On June 30, 2011, plaintiff's mood was euthymic,[16] his speech was clear, coherent, logical, and goal directed. (T. 354). Plaintiff told Dr. Patil that he was "doing well and feeling well," but that he was struggling with DSS because DSS was not

---

[13] Dr. Patil stated that the plaintiff did not "want" to take college courses and did not "want to work or anything." He only wanted to be a professional boxer. (T. 309). This description is not consistent with an inability to function.

[14] Abilify is an antipsychotic medication, used to treat the symptoms of schizophrenia, bipolar disorder and is often used with other medications to treat major depressive disorder. www.drugs.com/abilify.html.

[15] The court suspects that Dr. Patil meant "a" job, as in "any" job as opposed to "the" job, meaning a particular job. (T. 355). Dr. Patil also states that plaintiff "goes for jogging and then he goes for boxing in the boxing ring." (*Id.*) Either way, it does not appear that Dr. Patil believes that plaintiff is unable to work.

[16] Euthymic is defined as "normal" mood. www.medical-dictionary.thefreedictionary.com/euthymic.

providing him full coverage for his rent. Plaintiff and Dr. Patil discussed how to cope

with his anger about finances, and the doctor stated that "his frustration is legitimate."

(*Id.*) Plaintiff was still boxing, and he denied depression, mood swings, angry

outbursts, or any sleep disturbance.[17] He lived on his own in a small apartment, and

told Dr. Patil that he wanted to get his SSI back so that he can "be on his own two feet."

Dr. Patil then stated that "with his felony charges, he will not be able to get the job right

away . . . ." Dr. Patil stated that when plaintiff talked about reality, he got "serious."

Plaintiff told Dr. Patil that his anxiety was "under control" and his "irritability is under

control." Once again, the above description is not consistent with an individual who

has no ability to, or is essentially precluded from, social functioning as Dr. Patil's RFC

would indicate.

On October 25, 2011, the month prior to his November RFC evaluation, Dr. Patil

stated that plaintiff was on time, and he reported that he was "doing fine," except that

"periodically" he still has quite a bit of anxiety. (T. 376). Dr. Patil noted that plaintiff

---

[17] In the November 29, 2011 RFC, Dr. Patil noted that plaintiff had sleep disturbance, psychomotor agitation, and difficulty concentrating or thinking. (T. 386). His treatment notes do not indicate most of these problems on a regular basis. In February 2011, plaintiff mentioned that he had trouble sleeping. (T. 311). On April 12, 2011, plaintiff had a disagreement with Dr. Patil about "sleeping medicine." (T. 357). Dr. Patil stated that plaintiff "is telling me that he is no sleeping so he wants the sleeping medicine." (*Id.*) Plaintiff wanted a higher dose of Ativan, which Dr. Patil would not give him, and plaintiff "claimed that when he was here . . . a few years ago, he was taking Ativan 1 mg four times a day. So I told him he is not going to receive that with his volatile history of impulsivity, acting out behavior, and the *market value that is there outside on the street.*" (T. 357). The court has discussed this statement by Dr. Patil below, but it appears that Dr. Patil had some reservations about the extent of the plaintiff's sleep problems. In fact, the June 7, 2011 treatment notes state that plaintiff had "some trouble sleeping on and off, "but no significant insomnia." (T. 355). The June 30, 2011 treatment notes specifically stated that plaintiff denied *any* sleep disturbance. (T. 354). There was no mention of trouble sleeping in Dr. Patil's August, September or October, 2011 notes. (T. 376-78).

was dealing with a lot of frustration due to his lack of money, the denial of his SSI benefits, and his continuing problems with DSS. (*Id.*)  Plaintiff also spoke about having a girlfriend and wondering whether it would "work out."  Plaintiff told Dr. Patil that he was seeing his parole officer "regularly," and "that [was] going well." (*Id.*)  Plaintiff also saw his case manager "regularly."

Dr. Patil also discussed plaintiff's medications.  Dr. Patil stated that with Zyprexa and Ativan, plaintiff's "panic attacks are under control" and "his angry outbursts and irritability are in remission."  Plaintiff was still boxing and "keeping himself busy."  These comments do not indicate and individual who has "no ability" to relate to family and acquaintances or deal with a certain amount of stress.  Plaintiff is able to deal with others, keep medical and other appointments, and engage in leisure activities at the gym, where he is also attempting to become a "professional boxer."  The ALJ justifiably found that Dr. Patil's treatment notes are inconsistent with the doctor's November 29, 2011 RFC evaluation.[18]

---

[18] Dr. Patil has other contemporaneous treatment notes that do not support his ultimate November 2011 RFC. (T. 377-80).  On June 30, 2011, plaintiff told Dr. Patil that he was "doing well" and "feeling well." (T. 380).  He was frustrated with DSS, but Dr. Patil commented that his "frustration was legitimate." (*Id.*)  On August 24, 2011, Dr. Patil noted that plaintiff's "anxiety, irritability, and angry outbursts are fairly under control.  His paranoia is under control." (T. 378).  Plaintiff reported doing well on medicine, and he was not angry, upset, or demanding.  The doctor did note that plaintiff "still has some antisocial streak in him about his disability." (*Id.*)  Plaintiff got "angry" and began "cursing" people and the government when discussing the denial of SSI.  However, Dr. Patil stated that notwithstanding this anger, " he has no threatening behavior or any risky behavior." (*Id.*)  He denied any overt depression or suicidal thoughts. (*Id.*)  On September 21, 2011, plaintiff was boxing, and staying out of trouble. (T. 377).  He was neat and clean.  His affect was appropriate, and his mood was stable.  He discussed his ex-wife, who was attempting to contact him, but also discussed a new girlfriend, who he was "just getting to know."  He had some fears of being rejected, but vented his concerns, and he was "staying out of trouble." (*Id.*)

Finally, the court notes that on January 9, 2012, plaintiff's "Treatment Plan Review," written by Thomas Butler,[19] LMSW at Mental Health Connections indicated that plaintiff had been "compliant" with his therapy appointments and was "actively engaged in the process." (T. 383).  Mr. Butler also mentioned plaintiff's "new relationship," and stated that plaintiff was trying to "go with the flow."  He also stated that this was "significant considering past relationships." (*Id.*)  Mr. Butler stated that plaintiff would be discharged when his GAF was 70 or more for six months, he desired to terminate services, and had been able to "stay out of legal problems."  Although he still had "ongoing problems" with "anger dating,"[20] Mr. Butler noted that although plaintiff had been "doing well," he still needed clinical services and medication management, and that his GAF was currently 65,[21] indicating only "mild symptoms." (*Id.*)  Thus, plaintiff's most recent treatment records also do not support Dr. Patil's restrictive RFC.

In addition, the ALJ gave great weight to Dr. Shapiro's consultative evaluation, dated March 10, 2011, which the ALJ stated was consistent with Dr. Patil's contemporaneous treatment notes, dated March 15, 2011. (*Compare* T. 319-23 (Dr. Shapiro) *with* T. 309 (Dr. Patil)).  Dr. Shapiro recognized that plaintiff would have

---

[19] Mr. Butler is plaintiff's counselor.

[20] It is unclear if this is a typographical error.  Mr. Butler could have meant that plaintiff still had trouble with anger and dating, but it is unclear what "anger dating" might be.

[21] The Global Assessment of Functioning Scale (GAF) is a 100 point scale, and 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." DSM-IV-TR at 32-34.

some difficulty with following instructions and completing some tasks. (T. 322). She also recognized that he could have difficulty interacting appropriately with others, and attending work or maintaining a schedule. (*Id.*) However, upon examination, plaintiff's demeanor and responsiveness to questions was "cooperative," and his manner of relating, social skills, and overall presentations were adequate. (T. 321). His appearance and eye contact were appropriate. (*Id.*) His thought processes were coherent, even though his mood was irritable, tense, somewhat hostile, and he was easily annoyed. (T. 321). His attention and concentration were intact, his memory was intact, and his intellectual functioning was average, although Dr. Shapiro indicated that plaintiff's insight and judgment were poor. (T. 321-22). Dr. Shapiro noted that plaintiff's prognosis was "poor," but that she hoped that with continued intervention and support, he would find "symptom relief" and "maximized his abilities." Dr. Patil's contemporaneous treatment notes indicate that plaintiff was doing well with his treatment. The ALJ took plaintiff's social limitations into account when determining that plaintiff could perform work with very little co-worker contact and "over-the-shoulder" supervision.

While the court does not question that plaintiff has severe mental impairments as the ALJ found, and that he should continue his treatment and medications, the ALJ was justified in finding that the severity of his impairments was not sufficient to preclude substantial gainful activity. The ALJ was justified in rejecting the RFC of the treating physician and in relying upon the medical evaluations of the consultative physicians.

## VII.  CREDIBILITY

### 1.  Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929 (c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following

symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## B.    Application

Plaintiff argues that the ALJ erred in determining that plaintiff was not entirely credible. (Pl.'s Br. at 18-21). The ALJ did not question that plaintiff suffered from his mental impairments. The ALJ found that the extent of the limitations were not as great as plaintiff and Dr. Patil's RFC suggested. Plaintiff's stated limitations were inconsistent with his apparent ability to live by himself, keep appointments, and maintain relationships for period of time.

Plaintiff states that none of his treating physicians "raised any questions about the accuracy of Plaintiff's complaints, not did any make any suggestion that the plaintiff exaggerated his symptoms." (Pl.'s Br. at 20). However, that is not quite accurate. The court notes that in Dr. Patil's March 15, 2011 treatment notes, he states that

> At the present time he is being [sic] out of trouble. He says he
> has not gotten into arguments or fights with anybody. He
> lives in an apartment. He goes for a boxing ring [sic] to take
> out his aggression on a daily basis, which works out fairly
> well with him. He does not *want* to go to any college courses,

> *or does not want to work or anything*.  He just wants to be a
> professional boxer.

(T. 309) (emphasis added).  Dr. Patil states that plaintiff does not "want" to work, not

that he cannot work.  On April 12, 2011, Dr. Patil stated that plaintiff was "highly

agitated" because the "social security evaluation doctor was no good" because she told

him that he could work. (T. 357).  Dr. Patil stated

> He ranted and raved for 15 minutes about how he cannot work
> and how he has anxiety and panic attacks and that when he
> goes to work, he beats up people and ends up in jail.  *He had
> all these excuses*.

(T. 357).  Dr. Patil's reference to plaintiff's statements as "excuses," could justifiably

be interpreted as a reference to his credibility.  Plaintiff was also refusing to take

medication that could help his symptoms, and he was angry with Dr. Patil for refusing

to give him sleeping pills. (T. 357).  Plaintiff stated that he would go to another clinic,

and Dr. Patil told plaintiff that he was free to do so and get a second opinion.  However,

the doctor stated that plaintiff did not express any threats, he was simply angry that Dr.

Patil would not give him sleeping pills.[22]  He was able to handle Dr. Patil's refusal,

without any threatening behavior.  Coupled with plaintiff's apparent ability to live on

---

[22] Plaintiff was asking for Ativan, a drug used to fight anxiety. www.drugs.com/ativan.html.
Dr. Patil did not wish to give plaintiff the dosage that he requested due to plaintiff's "volatile history of
impulsivity, acting out behavior, and the market value that is there outside on the street." (T. 357).  The
doctor told plaintiff that he would only give him a certain dosage, and that he could take the Abilify,
(an anti-psychotic drug which is also used to treat bipolar disorder, mood swings, anxiety, and improve
concentration- www.webmd.com/drugs/drug-64439-Abilify+oral.aspx?drugid=64439), but plaintiff did
not want to do that. (*Id.*)

his own, have a girlfriend,[23] and have aspirations of becoming a professional boxer, the ALJ's credibility determination was supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: June 25, 2014

*Andrew T. Baxter*

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

---

[23] Plaintiff testified that he had a girlfriend, and that he "hang[s] out with her sometimes when, when we can meet up right, because she works and stuff." (T. 69). Plaintiff also testified that he goes to visit his mother because she is old, but he has to take her "in moderation." (*Id.*) When the ALJ asked plaintiff whether he had looked for work since his release from incarceration, plaintiff's response was "I get DSS; no." (T. 66). When the ALJ asked plaintiff why he did not look for a job, plaintiff stated "Because I'm disabled." (*Id.*) Plaintiff appears to assume that since he was getting SSI before he went to prison, he would just begin receiving it again upon his release as he did the last time he was released from prison. (*See* T.65).